FERNANDO SIERRA BERDECÍA, COMMISSIONER OF LABOR OF PUERTO RICO, Plaintiff and Appellant, *v.* PEDRO P. NIDO, ETC., Defendants and Appellees.

No. 10025. Argued February 1, 1950.—Decided November 29, 1950.

848

*Ramón Cancio,* counsel for the Department of Labor, for appellant.   *R. Rivera Zayas, C. Rivera Cestero,* and *Milton F. Rúa,* for appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

The Commissioner of Labor of Puerto Rico brought this suit for injunction under § 23 of Act No. 8 of April 5, 1941, as amended by Act No. 451 of May 14, 1947,[1] against Pedro P. Nido, by himself and in representation of the Sugarcane Growers of Puero Rico, members of the Sugarcane Section of the Puerto Rico Farm Bureau,[2] prohibiting them from paying to their workers "as corresponding to the supplemental payment of 47.9 cents in the price of sugar for the 1946 crop, made by the Commodity Credit Corporation, a sum less than 18 cents per working day during said period, or from in any other way violating, or advising others to violate, subdivision 6 of Clause A, of Mandatory Decree No. 3 of the

---

[1] Section 23, insofar as pertinent, provides:

"It shall be the duty of the Commissioner of Labor, by himself or through his duly authorized agents, to compel compliance with all the decrees, rules, and regulations which the board may issue in the exercise of the powers vested in it by this Act.  Full powers and ample authority are hereby conferred upon the Commissioner of Labor to adopt such measures as may be necessary for said purposes; and to that end it may institute injunction proceedings and such other proceedings as may be necessary to make effective the terms of this Act and to compel compliance with the decrees, resolutions, or orders, issued by said board."

[2] The petitioner later dropped his class action and prosecuted his action against the defendant Nido only.

Minimum Wage Board of Puerto Rico." After a motion to dismiss was overruled and the petition answered, trial was held and the District Court of Guayama entered judgment dismissing the petition.

The facts involved in the case, briefly set forth, are the following:

The Commodity Credit Corporation, hereinafter referred to as the C.C.C., an agency of the Federal Government, purchased the production of Puerto Rican raw sugar during 1945–46, pursuant to § 3 of the "1945–46 Purchase Contract Puerto Rican Raw Sugar," at a basic minimum price of 3.845 cents per pound, f.o.b. in the actual port of shipment. By virtue of § 4 of the same contract the defendant also received from the C.C.C. a "support payment" of 87.5 cents per 100 pounds of sugar processed from his canes during the crop corresponding to said period, it being set forth in the receipt signed by the defendant that such payment would be treated as a price increase of sugar for the purpose of compliance with § (e) of the "1946 Wage Determination of the Secretary of Agriculture" issued November 16, 1945.

After the 1945–46 crop was over, the C.C.C. made to the defendant in 1947 a supplemental payment of 47.9 cents per 100 pounds of sugar processed from his canes during the 1946 crop. Upon receiving this payment, the defendant signed as part of the contract with the C.C.C. for the sale of his sugar of 1946–47, a receipt [3] by which, among other particulars, he

---

[3] The receipt referred to (petitioner's exhibit 3-A) reads:

"UNITED STATES DEPARTMENT OF AGRICULTURE—Production and Marketing Administration—*1946–47 Purchase Contract Puerto Rican Raw Sugar*—GROWER'S RECEIPT FOR SUPPLEMENTAL PAYMENT WITH RESPECT TO 1945–46 CROP PUERTO RICAN RAW SUGAR.

"The undersigned grower certifies that he has received $. . . . . . . . . . . from. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . being the grower's share, pursuant to the Determination of Fair and Reasonable Prices for the 1945–46 Crop of Puerto Rican Sugarcane, of the supplemental payment of 47.9 cents per 100 pounds made by Commodity Credit Corporation with respect to the quantity of 1945–46 crop sugar produced from 1945–46 crop Puerto Rican sugarcane delivered by the undersigned grower to the-Seller.

accepted that in consideration of such payment he agreed to treat same as a price increase of 47.9 cents per 100 pounds of sugar over the New York ceiling price in effect on October 23, 1945 (3.75 cents per pound) with respect to the sugar of the 1945–46 crop, *in addition* to the previous support payment of 87.5 cents per 100 pounds of sugar which the growers had agreed to treat as a price increase of the sugar of said crop, all for the purpose of compliance with § (e) of the Wage Determination issued November 16, 1945.

Pursuant to the aforesaid § (e) applicable to the workers employed in the production, cultivation, or harvesting of sugar cane in Puerto Rico during the year 1946, the defendant was obliged to pay them, with respect to the support payment of 87.5 and the supplemental payment of 47.9, the amounts of 43 cents and 11 cents, respectively, that is, a total of 54 cents as a wage increase per day to each laborer.

By virtue of a collective agreement entered into with his workers for the 1945–46 crop, the defendant bound himself to pay and paid to his workers a 45-cent wage increase as corresponding to the support payment of 87.5 cents they had received. Having already paid, by virtue of the aforesaid collective agreement, a 45-cent increase, he would only have to pay the sum of 9 cents more as a wage increase per day

"In consideration of this payment, the undersigned agrees to treat such supplementary payment, for the purpose of compliance with Section (e) of the 1946 Wage Determination of the United States Secretary of Agriculture, issued November 16, 1945, as a price increase of 47.9 cents per 100 pounds of 96° raw sugar over the New York ceiling price in effect on October 23, 1945 (3.75 cents per pound) in addition to the .875 cent per pound support payment which the grower has previously agreed to treat as a price increase, on and from the date cutting of cane was begun on the farm operated by the undersigned for the grinding of the 1945–46 crop until January 1, 1947.

"The grower further agrees that he will make available his share of the raw sugar processed from 1946–47 crop sugar cane produced by him for sale to Commodity Credit Corporation by Seller under the 1946–47 Purchase Contract Puerto Rican Raw Sugar, less the grower's proportionate share of the quantity for local consumption stated in Article One of the 1946–47 Purchase Contract Puerto Rican Raw Sugar entered into between Commodity Credit Corporation and Seller."

with respect to the supplemental payment of 47.9 cents per 100 pounds of sugar, that is, the 54-cent increase pursuant to the payments referred to.

The appellant contends, however, that although the appellee complies with the "Wage Determination" paying to his workers 9 cents of the payment of 47.9 cents, he does not thus comply with Clause A-6 of Mandatory Decree No. 3 of the Minimum Wage Board of Puerto Rico, approved February 27, 1943, pursuant to which he must pay to his workers 18 cents of said 47.9 cent payment. Said clause provides as follows:

"*Increase or Decrease in Sugar Price.*—In the event that the price of sugar, fixed today by the Federal Government at three dollars seventy-four cents ($3.74) per 100 pounds, should go up or down, the increase or decrease will be distributed on the basis of 50 per cent for the grower or producer and 50 per cent among the laborers of said grower or producer.

"Where the price of sugar is not fixed by the Government, it will be determined on the basis of the fortnightly average price resulting from the sales of Puerto Rican raw sugar in the New York market. (CIF New York.)"

In order to implement the provision copied above, the Minimum Wage Board of Puerto Rico promulgated a table reducing to dollars and cents the share corresponding to each laborer in any price increase per 100 pounds of sugar, taking $3.74 per 100 pounds of sugar as the basic price. The table is drawn up on the basis of 1-cent progressive increases from 1 cent up to one dollar, a correlative increase of ⅜ of a cent (37½%) corresponding to each one-cent progressive increase in the price of sugar, that is, from a wage increase of .375 for the first cent of increase in the price of sugar up to a wage increase of 37.5 cents for a one-dollar increase in the price of sugar.

Computing the payment of 87.5 cents on the basis of the table of the Minimum Wage Board, a 33-cent wage increase is obtained, which is less than the 43-cent increase resulting

from the Determination of the Secretary of Agriculture. However, the payment of 47.9 cents pursuant to the aforesaid table, gives a wage increase of 18 cents, which is higher than the 9-cent difference he would still have to pay to the appellee in order to comply with the above-mentioned Determination of 54 cents, in view of the fact that by virtue of the collective agreement he had already paid 45 cents.

The conflict between the parties consists essentially in that the appellee contends that he is only obliged to pay said 9 cents, because the 54 cents of the Secretarial Determination are more than the 51 which correspond to the sum of the 33 and the 18 of the table of the Minimum Wage Board. Appellant insists that the 18 cents are more than 9 and that the appellee is obliged to pay to his laborers said 18 cents in order to comply with Mandatory Decree No. 3 of the Minimum Wage Board of Puerto Rico.

In other words, appellant contends that the support payment of 87.5 cents should be considered as a separate and independent payment from the supplemental payment of 47.9 cents subsequently made by the C.C.C. to the appellee as a readjustment to the price of sugar of 1946 and as part of the consideration or cause for the contract of sale of the sugars of 1947 and that, "Since they are two increases and not one, both must be computed separately in order to obtain the corresponding wage increase in accordance with the table of the Minimum Wage Board of Puerto Rico which implements Clause A-6 of Mandatory Decree No. 3."

The lower court, in dismissing the petition, arrived at the conclusion that pursuant to the express terms of the contracts entered into between the parties and the receipts signed by the defendant, the payment of the 47.9 cents constituted "a payment supplemental to the former payment of 87.5 cents, that is, in addition to the latter, added to the latter, not as an independent price increase . . ."

The appellant has charged the lower court with the commission of seven errors. Three of them refer to the fact

that the court did not decide against the appellee certain special defenses he alleged and we consider that such assignments do not lie for, had they been committed, the party who might be affected thereby, that is, the defendant, obtained a favorable judgment on other grounds. As to the remaining errors, they may be synthesized into one to the effect that the court erred in considering that the two payments of 87.5 cents and 47.9 cents made by the C.C.C. to the defendant, were support payments equivalent to a single increase in the basic minimum price at which the C.C.C. paid the 1946 sugars and as a consequence deciding that since the defendant had already paid to his laborers 45 cents corresponding to the 87.5 cents, he only had to pay them 9 additional cents in order to complete the 54 cents to which they were entitled under the Determination of the Secretary of Agriculture, Clause A-6 of Mandatory Decree No. 3, therefore, not being applicable.

After a thorough study of the question raised we are of the opinion that the lower court did not err in dismissing the petition in this case.

It is true that pursuant to Article 4 of the "1945–46 Purchase Contract Puerto Rican Raw Sugar" entered into between the C.C.C. and the sugar growers, it was agreed that the former would pay to the latter a support payment, which was actually made, amounting to 87.5 cents per 100 pounds of sugar and that, pursuant to Article 4 of the "1946–47 Purchase Contract Puerto Rican Raw Sugar" and as part of the cause or consideration of said contract, the C.C.C. agreed to make to the sugar producers an "Adjustment Payment 1945–46 Crop Sugar" as soon as possible after all raw sugar of the 1945–46 crop purchased by the C.C.C. under the "1945–46 Purchase Contract Puerto Rican Raw Sugar," had been shipped. However, the fact that the first payment was termed "support payment" and the second "adjustment payment" does not mean, as the appellant argues, that two separate increases over the basic minimum price established in the 1945–46 contract are involved. Among the documentary

evidence admitted in this case there are two letters which tend to show the scope and meaning of the two payments made by the C.C.C.

The first (petitioner's exhibit 13) is a letter addressed by "Administrator of the Sugar Act of 1937" to the Hon. August H. Andresen, member of the House of Representatives of the United States, on March 14, 1947, which in part recites:

"March 14, 1947

"Hon. August H. Andresen
"House of Representatives
"Dear Mr. Andresen:

"This will acknowledge your letter of February 12, 1947, addressed to Mr. James H. Marshall, transmitting a letter from Mr. E. T. Fiddler, a member of a firm of Puerto Rican attorneys, with respect to the purchase of Puerto Rican Sugar by Commodity Credit Corporation.

"Mr. Fiddler's letter does not reflect either the purpose or terms of the 1947 Puerto Rican purchase contract. Neither does it reflect the numerous other programs undertaken by the Department of Agriculture to aid the Puerto Rican sugar industry. Throughout the war and prewar period the Department of Agriculture has given Puerto Rican producers the same fair and equitable treatment it has given continental and other domestic producers. Sugar Act payments have been made under the same formula, as provided in law, to Puerto Rican producers as to other producers. Likewise, benefit payments to producers and mills have been applicable in Puerto Rico as well as in other domestic areas. In addition, the Commodity Credit Corporation has purchased the Puerto Rican crops and has provided for advances at 90 per cent of the estimated current values of stocks remaining after July 1 of each year, and has assumed shipping responsibilities for Puerto Rican sugar during the war period to give that area benefits fully equal to those afforded Cuba under our crop purchase program.

"Mr. Fiddler seems to feel that the Commodity Credit Corporation is attempting to hold Puerto Rico down to the Cuban level. Actually the Corporation is undertaking to do exactly the opposite, namely, to give Puerto Rico the advantage of every benefit obtained by Cuba under The 1946 and 1947 Cuban Sugar Crops Purchase and Sale Contract. Puerto Rican producers

entered into contracts for the sale to the Commodity Credit Corporation of their 1946 crop sugar prior to the consummation of the final agreement with Cuba. The Cuban purchase contract contains certain so-called escalator clauses, which require that the price paid Cuba for sugar thereunder must be increased in the event the index numbers for food prices and living costs in the United States increase. The sharp price rises that occurred in food costs last summer and fall therefore resulted in higher prices being paid for 1946 crop Cuban sugar than those contemplated at the beginning of the year.

"Naturally, Puerto Rico is paid higher prices than Cuba in order to reflect the tariff differential and any advantages that may exist as a result of lower costs in shipping Puerto Rican sugar to the continent. *However, the Commodity Credit Corporation believes that it should also pay Puerto Rico increases in the price for 1946 sugar above those provided in the former Puerto Rican purchase contract comparable with the increases paid for Cuban sugar under the escalator clauses of the Cuban contract. To do this it will be essential that Puerto Rican producers sell their 1947 crop sugar to the Commodity Credit Corporation, as Cuba has done, in order to do their full part in meeting the current sugar shortage.*

"Obviously, it would be difficult for the Commodity Credit Corporation to justify *any further payment with respect to 1946 crop Puerto Rican sugar if Puerto Rican producers refuse to enter into a 1947 agreement, or undertake to hold their sugar off the market as a means of gaining speculatively in the possible event of decontrol.* Since the present proposed agreement for Puerto Rican sugar includes cancellation privileges for the Puerto Rican industry as a whole in the event of decontrol, it should be pointed out that it would also be difficult to justify the Corporation's entering into it if, for any reason, sugar should be decontrolled before the 1947 agreements are consummated.

"        .        .        .        .        .        .        .        .

"Mr. Fiddler also refers to the fact that wages in Puerto Rico are 30 per cent above those of a year ago. As you know, *Puerto Rican wage rates in the sugar industry are related to sugar prices under the fair wage determinations made by the Secretary of Agriculture, in accordance with the Sugar Act of 1937, as amended.*" (Italics ours.)

And the second (defendant's exhibit 4) is a letter addressed on October 6, 1947 by Charles W. Fowler, "Chief, Purchase and Price Support Division" of the Department of Agriculture of the United States, to Attorney G. Rivera Cestero, one of the attorneys of the defendant, and which reads:

"Oct. 6, 1947

"Mr. G. Rivera Cestero
"Rivera Zayas & Rivera Cestero
"El Mundo Building
"San Juan 7, Puerto Rico
"Dear Mr. Cestero:

"Your letter of September 16, 1947, to the Director of Information, Library of Congress, regarding the question 'Are support payments made by the Commodity Credit Corporation part of the price of sugar?', has been referred to this office which administers the Purchase and Price Support Programs for Sugar of the Commodity Credit Corporation.

"The Price Support Programs of the Commodity Credit Corporation had as their purpose the maintenance of ceiling prices in the view of raising costs. Therefore the price support payments were made *in lieu of price increases and represented payments in addition to the amounts which producers received from price*. The support payments were, however, adjusted downward for increases in the price of sugar whenever such increases occurred. In the case of the 1946-crop these increases in price were very substantial and offset the support payment for different areas in varying degrees, depending on the time at which the sale of sugar from each area took place. In the case of Louisiana and Florida no price support payments were made on 1946-crop sugarcane. Puerto Rico, Hawaii, and the beet areas all received some price support payments but the amounts varied because of the timing of sales.

"*There will be no price support payments in addition to the purchase price for Puerto Rican raw sugar of the 1947-crop* but the price under this purchase increases as the price of Cuban sugar increases. In the case of Hawaiian raw cane sugar and continental beet sugar of the 1947-crops any support payment (though it appears now that none is likely to be payable) will be in addition to price since the sugar is sold through commercial channels." (Italics ours.)

The contents of these letters is in agreement with the wording of the receipt signed by the defendant when he received from the C.C.C. the 47.9 cents (plaintiff's exhibit 3-A, footnote 3, *supra*), it being set forth therein that the defendant received the sum of blank dollars as his share, pursuant to the Determination of Fair and Reasonable Prices for the 1945-46 sugar cane crop, of the *supplemental* payment of 47.9 cents per 100 pounds made by the C.C.C. with respect to the quantity of 1945–46 crop sugar produced from the 1945-46 crop sugar cane delivered by the grower to the seller, it being further stated that:

"In consideration of this payment, the undersigned agrees *to treat such supplementary payment*, for the purpose of compliance with Section (*e*) of the 1946 Wage Determination of the United States Secretary of Agriculture, issued November 16, 1945, *as a price increase of 47.9 cents* per 100 pounds of 96° raw sugar over the New York ceiling price in effect on October 23, 1945 (3.75 cents per pound) *in addition to the .875 cent* per pound support payment *which the grower has previously agreed to treat as a price increase*, on and from the date cutting of cane was begun on the farm operated by the undersigned for the grinding of the 1945–46 crop until January 1, 1947." (Italics ours.)

In accordance with this evidence, even though the payment of the 47.9 cents was set forth as part of the cause or consideration of the 1946–47 contract and labeled "adjustment payment," the intention of the parties and especially the public policy expressed by the C.C.C. as to said payment, was clearly that said payment constituted a supplemental and additional payment to the payment of 87.5 cents already made and that both would be considered as a price increase of the 1945–46 crop for the purposes of the Wage Determination of the Secretary of Agriculture of the United States. Hence, said Determination is applicable to the 47.9 cents subsequently paid, not separately, but as supplemental and additional to the 87.5 cents previously paid, that is, to the sum of both amounts, $1.354 per 100 pounds of sugar, which is tantamount to the defendant having to pay to his laborers an additional 54 cents.

If Mandatory Decree No. 3 of the Minimum Wage Board were applied, the sum to be paid would only be 50.8 cents which is less than the sum of the Secretarial Determination. If the defendant had paid to his laborers, pursuant to the Secretarial Determination, upon receiving the 87.5 cents, 45 cents, he still has to pay them the difference between 54 and 45 cents, that is, 9 cents, which is the amount he has always been willing to pay. The lower court did not err in deciding thus dismissing the petition.

Before closing this opinion we wish to state that although the appellee moved the lower court to dismiss the petition on the ground that an injunction did not lie in this case, said motion was overruled. Even though the defendant did not appeal from said order, he has insisted in his brief on this question. We believe he is right and that the injunction was not the remedy in this case. However, since the appellant admits that even though the appellee were correct, we could always consider and decide the case as if it were an action for a declaratory judgment, it must be understood that we are thus deciding it. *Cf. Núñez v. Benítez, Chancellor*, 65 P.R.R. 812, 816–17.

The judgment will be affirmed.